UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FORT INDEPENDENCE INDIAN
COMMUNITY, a federally-
recognized tribe,

                               NO. CIV. S-08-432 LKK/KJM

      Plaintiffs,

   v.

                             O R D E R

STATE OF CALIFORNIA; ARNOLD
SCHWARZENEGGER, Governor of
the State of California;
JERRY BROWN, Attorney General
of the State of California,

      Defendants

_____/

    Plaintiff Fort Independence Indian Community, a federally

recognized tribe, brings suit against the State of California and

associated officials (collectively, the "State"). The Tribe's sole

remaining claim alleges that the State has violated its obligation

to negotiate in good faith regarding a Tribal-State gaming compact.

In particular, the Tribe argues that the State has improperly

insisted upon a revenue sharing agreement. Although the Indian

Gaming Regulatory Act is apparently hostile to such agreements,

1

they have become common.  These agreements have also been upheld by the Department of the Interior, the agency that administers this aspect of the IGRA.

The parties have filed cross motions for summary judgment. The court resolves the matters on the papers, including supplemental briefing, and after oral argument.  Questions of material fact remain, but the court grants summary adjudication/partial summary judgment as to several issues.

## I.  BACKGROUND

**A.    Statutory Background**

The Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq., divides gaming into three classes.[1]  Class III gaming, which includes slot machines and similar devices, is at issue in this case.  Under IGRA, a tribe may conduct Class III gaming only in "conformance with a Tribal-State compact entered into by the Indian Tribe and the State and approved by the Secretary of the Interior." Coyote Valley Band of Pomo Indians v. California (In re Indian Gaming Related Cases Chemehuevi Indian Tribe), 331 F.3d 1094, 1097 (9th Cir. 2003) (citing §§ 2710(d)(1), (d)(3)(B)) (hereinafter Coyote Valley II).  Such gaming must also comply with certain other conditions not relevant here.  Id.

A tribe seeking to conduct Class III gaming may request that the state "enter into negotiations for the purpose of entering into a Tribal-State compact." § 2710(d)(3)(A).  If the state permits

---

[1] For the remainder of this order, the court cites to IGRA using only the section number.

other Class III gaming of the types sought, the state must honor the request and negotiate in "good faith."  Id., Rumsey Indian Rancheria of Wintun Indians v. Wilson, 64 F.3d 1250, 1258 (9th Cir. 1994), amended by 99 F.3d 321 (9th Cir. 1996).  The State may negotiate "regarding aspects of class III tribal gaming that might affect legitimate State interests." Coyote Valley II, 331 F.3d at 1097; see also § 2710(d)(3)(C) (enumerating topics that "may" be addressed by compacts).

The present dispute principally concerns the extent to which a state may seek money from a tribe.  IGRA does not provide authority to "impose any tax, fee, charge, or other assessment" other than assessments necessary to defray the costs of regulating gaming.  § 2710(d)(4).  However, a state does not "impose" a fee when the state "offer[s] meaningful concessions in return for its demands."  Coyote Valley II, 331 F.3d at 1111.  IGRA separately provides that "any demand by the State for direct taxation of the Indian tribe" shall be considered as non-conclusive evidence of bad faith.  § 2710(d)(7)(B)(iii)(II).

IGRA provides a cause of action whereby tribes can enforce the obligation to negotiate in good faith.  § 2710(d)(7)(A); see also S. Rep. 100-446, *14-15 (Aug. 3, 1988).  Although IGRA does not waive sovereign immunity, California has by statute consented to suit.  Cal. Gov. Code § 98005, Seminole Tribe v. Florida, 517 U.S. 44 (1996); see also Coyote Valley II, 311 F.3d at 1101 n.9.[2]

_____

[2] Many other states have not consented to suit, leaving tribes in those states with little ability to enforce IGRA's requirements.

1    Once a compact has been negotiated, it does not take effect
2  until the Secretary of the Interior affirms that it complies with
3  IGRA.  § 2710(d)(8)(B)(I).

4  **B.   The 1999 California Compacts**

5    In the gaming context, California's present relationship with
6  tribes is largely the product of 60 compacts negotiated in 1999.
7  The Ninth Circuit provided the history of these negotiations in
8  Coyote Valley II, 331 F.3d at 1100-07, the relevant portions of
9  which are summarized here.  Prior to 1999, California prohibited
10 slot machines and other forms of class III gaming sought by the
11 tribes.  Accordingly, California was not obliged to negotiate
12 compacts authorizing such gaming, and refused to do so.  Rumsey, 64
13 F.3d at 1258, § 2710(d)(3)(A).  In 1998, a coalition of tribes
14 introduced a ballot initiative that would compel the State to
15 change this policy.  This measure passed, and although it was later
16 invalidated by the California Supreme Court, it set in motion a
17 process culminating in extensive negotiations, further legislation,
18 and an amendment to the California Constitution.  The amendment to
19 the Constitution included the following:

20           the Governor is authorized to negotiate and
             conclude compacts, subject to ratification by
21           the Legislature, for the operation of slot

22 ────────────────────
   See, e.g., Texas v. United States, 497 F.3d 491, 504 (5th Cir.
23 2007) (Seminole Tribe "produced the unexpected result that a state
   may 'veto' Class III gaming by exercising its Eleventh Amendment
24 sovereign immunity."), Pueblo of Sandia v. Babbitt, 47 F. Supp. 2d
   49, 52 (D.D.C. 1999) (explaining that New Mexico had not consented
25 to suit under § 2710(d)(7)).  The availability of this immunity is
   presumably responsible for the dearth of caselaw interpreting
26 IGRA's good faith provisions.

> machines and for the conduct of lottery and
> banking and percentage card games by federally
> recognized Indian tribes on Indian lands in
> California in accordance with federal law.
> Accordingly, slot machines, lottery games, and
> banking and percentage card games are hereby
> permitted to be conducted and operated on
> tribal lands subject to those compacts.

Calif. Const. Art IV, § 19(f).[3] Concurrent with the effort to pass this amendment, the State negotiated with a group of tribes to produce a template compact. Sixty tribes adopted the template (the "1999 Compact") shortly after the amendment was ratified. Coyote Valley II, 331 F.3d at 1104.

The sixty tribes' adoption of this compact, and the contemporarily passed legislation, established the major features of California's present treatment of gaming. Most significantly, tribes are the exclusive operators of slot machines and certain other forms of class III gaming. Prior to 1999, the California constitution had prohibited all slot machines and certain other forms of gaming desired by the tribes. As part of the changes surrounding the 1999 compacts, the constitution was amended to allow tribal gaming, although other gaming remains prohibited.

A second major feature is the Revenue Sharing Trust Fund ("RSTF"), which redistributes wealth among the tribes. Tribes adopting the 1999 compacts pay into the fund by purchasing "'licenses' to acquire and maintain gaming devices in excess of"

---

[3] For the remainder of this order, the court uses "gaming" to refer to the types of Class III gaming enumerated in Calif. Const. Art IV, § 19(f), i.e., those forms of gaming which Tribes may be authorized to conduct, but which are otherwise prohibited in California.

certain quantities.  Coyote Valley II, 331 F.3d at 1105.  The RSTF
pays out to "non-compact tribes," defined as "[f]ederally
recognized tribes that are operating fewer than 350 gaming
devices."  Non-compact tribes each receive up to $1.1 million
annually from the RSTF.  The 1999 Compacts explicitly provide that
non-compact tribes are third party beneficiaries of the compacts,
but also that non-compact tribes have no right to enforce the
compacts.

     Two other features of the 1999 Compacts are pertinent here.
The 1999 Compacts called for payments of a percentage of revenue
into a "Special Distribution Fund."  This fund may be used only to
pay expenses related to gaming, including shortfalls in the RSTF.
Id. at 1113-14.  The 1999 Compacts also obliges tribes to provide
a procedure "addressing organizational and representational rights
of Class III Gaming Employees and other employees associated with
the Tribe's Class III gaming enterprise."  Id. at 1116 (quoting
section 10.7 of the 1999 Compact).  The Ninth Circuit has held that
both of these provisions are consistent with IGRA.  Id. at 1114,
1116.

**C.   Other State-Tribal Gaming Compacts**

     California compacts negotiated since 1999 and compacts
negotiated by other states contain several additional features
pertinent here.

     The post-1999 California compacts are notable in two ways.
First, the State has entered twenty one compacts with "non-compact
tribes," allowing them to operate fewer than 350 gaming devices and

still receive payments from the RSTF.  Conversely, there are no federally recognized California tribes operating fewer than 350 class III gaming devices pursuant to a compact that do not receive RSTF payments.  Second, many California compacts subsequent to the 1999 compacts provide for "revenue sharing" with the state.  See, e.g., Tribal-State Compact Between the State of California and the Pinoleville Pomo Nation, executed March 10, 2009, Pl.'s RFJN Ex. 6. These provisions, unlike the "special distribution fund" approved in Coyote Valley II, provide for payment into the State's general fund, such that the funds received may be used for any purpose. Ordinary English would appear to require that a program in which a percentage of revenues must be paid to a state is a tax.  However, the arrangements between sovereigns, the State and the Tribes, use the term "revenue sharing" to refer to programs of this type.[4]  This term is used ubiquitously in compacts with California and with other states, and by the Department of the Interior.  Accordingly, the court adopts this practice here.  In California, compacts use the term "revenue sharing" to refer to sharing of revenue between the tribe and the state, and the acronym "RSTF" to refer to the sharing of revenue between tribes.  For the remainder of this order, this court uses the term "unrestricted revenue sharing" to refer to programs wherein a portion of gaming revenues is paid into the state's general fund and the state's use of those payments is

_____

[4] The court assumes that the term is meant to indicate that the payments are negotiated, rather than having been "imposed" or "demanded," which the IGRA would disfavor.

1  unrestricted.

2  Post-1999 California compacts with unrestricted revenue
3  sharing provisions specify that revenue sharing is offered in
4  exchange for the "meaningful concession" of continued tribal
5  exclusivity. See, e.g., Tribal-State Gaming Compact between The
6  Coyote Valley Band of Pomo Indians and The State of California, §§
7  4.3.1(b),15.3 (Aug. 24, 2004) (accepted by the Secretary of the
8  Interior at 69 Fed. Reg. 76004) available at
9  http://www.cgcc.ca.gov/compacts/coyote_valley%20Compact.pdf.
10  Notwithstanding the fact that California law presently prohibits
11  all non-tribal gaming, the State promises in these compacts to
12  prohibit non-tribal gaming within a certain region. Id. The
13  revenue sharing provisions become void in the event that non-tribal
14  gaming becomes permitted within this area.

15  Numerous other states have also negotiated compacts with
16  tribes that provide for unrestricted revenue sharing coupled with
17  tribal exclusivity provisions. See, e.g., Pueblo of Sandia v.
18  Babbitt, 47 F. Supp. 2d 49, 52 (D.D.C. 1999) (concerning compact
19  negotiated with New Mexico); see also Coyote Valley II, 331 F.3d at
20  1115 n.17 (noting that Connecticut, New Mexico and New York have
21  entered compacts containing such provisions).

22  **D.   Fort Independence's Negotiations**

23  Having provided this background, the court turns to the facts
24  particular to this case. Fort Independence is an Indian tribe
25  located in Inyo County, California, and is recognized by the
26  Secretary of the Interior. See 72 Fed. Reg. 13,648 (March 22,

2007).  Fort Independence does not currently have a compact with the State, and does not conduct any Class III gaming.  As a "non-compact" tribe, Fort Independence (hereinafter the "Tribe") presently receives annual payments of $1.1 million from the RSTF.

From July 2004 to January 2008, the Tribe negotiated with the State regarding formation of a gaming compact.  In general, the Tribe argues that the State negotiated in bad faith by requesting unrestricted revenue sharing and that the Tribe relinquish the right to receive RSTF payments.  The parties also negotiated the range of geographic exclusivity guaranteed to the Tribe and the number of devices the Tribe would be authorized to operate. Informed by this overview, the court turns to the history of the negotiations.

### 1.   July 2004 Request

In July 2004, Fort Independence formally requested that the State enter into Tribal-State Compact negotiations under the IGRA, 25 U.S.C. § 2710(d)(3)(A).  In its request to begin negotiations, the Tribe stated:

> The Fort Independence Tribe agrees with the Governor's belief that Indian Tribes should provide compensation to the state in recognition of the unique privilege and benefit that gaming provides.

(Pl.'s Statement of Undisputed Facts ("PSUF") 1.)[5]  The Tribe "estimate[d] that the approximately 80 gaming devices the Tribe is seeking would generate a win [to the tribe] per day of about $80

---

[5] Facts taken from the parties' undisputed statements are in fact undisputed.

per machine."   Id.

## 2.   December 2004 Draft

In response to this request, the Tribe and the State began negotiations in the fall of 2004.   (PSUF 2; Def.'s Record of Negotiations ("RN") Ex. B)  In December 2004, the Tribe provided a draft compact preamble to the State.  This draft preamble mirrored the language of the 1999 compacts, expressly recognizing the benefits the Tribe would gain from its tribal exclusivity, and identifying exclusivity as a "meaningful concession."[6] (PSUF 6.) The State negotiator incorporated this preamble into a draft compact.  (PSUF 8.)  The State contends that the terms of this draft compact were based on the parties' negotiations up to that

---

[6] The unabbreviated passage from the preamble provided:

Whereas, the State and the Fort Independence Paiute Tribe recognize that the exclusive rights that the tribe will enjoy under this Compact create a unique opportunity for the Tribe to operate a Gaming Facility in a economic environment free from competition from Class III Gaming on non-Indian lands in California and that this unique economic environment is of great value to the Tribe; and

Whereas, the Tribe in consideration of the exclusive rights enjoyed by the Tribe, the right to operate the desired numbers of Gaming Devices, and other meaningful concessions offered by the State in good faith negotiations, agrees to make a fair revenue contribution to the State, to enter into arrangements to mitigate to the extent possible the off-reservation environmental and direct fiscal impacts on the local community and local governments, and to offer consumer and employee protections.

1  point; the Tribe insists that the State unilaterally proposed the

2  terms.   The  draft  provided  for  revenue  sharing  with  the  State,

3  ranging from 10 to 25 percent of the Tribe's net win.   (PSUF 8.)

4  The draft also included a section on the RSTF, but this was marked

5  "[open]"  rather  than  containing  any  specific  provisions.   The

6  parties did not discuss the draft or compact again until January

7  26, 2006.

8      **3.   Tribe's Disagreement in June and July 2006**

9      In  the  summer  of  2006,  the  Tribe  communicated  various

10  objections to the State regarding the State's positions.   The Tribe

11  argued that unrestricted revenue sharing was prohibited because the

12  State had offered an inadequate concession.   (Decl. of Darcie L.

13  Houck  Supp.  Pl's  Mot.,  Ex  O.)   The  Tribe  further  argued  that

14  relinquishment of RSTF payments were prohibited, that the State was

15  not permitting enough gaming devices, that the draft provided for

16  too  much  local  control  over  ancillary  issues,  and  that  the

17  environmental provisions were too burdensome. Id.

18      **4.   Drafts Prepared by The Tribe**

19      In December of 2006, the Tribe presented a photocopy of the

20  State's  draft  compact  on  which  the  Tribe  had  made  handwritten

21  modifications.   (Houck Decl. Ex. S.)   This draft, as modified,

22  included  the  earlier  preamble,  a  schedule  for  revenue  sharing

23  payments  to  the  state,  an  RSTF  section  stating  "use  language

24  similar to other compacts, w/$10 M threshold --> $900/machine," and

25  an exclusivity provision prohibiting non-tribal gaming in a 55 mile

26  radius.

1   The Tribe sent the State another draft in February of 2007.
2   (Houck Decl. Ex. U.)   This draft retained the earlier preamble.
3   However, it did not provide for revenue sharing, and allowed the
4   Tribe to continue to receive payments from the RSTF, although the
5   draft specified that these payments would only be used for non-
6   gaming activities.

7   In May of 2007, the Tribe made another proposal.  (Houck Decl.
8   Ex. X.)   This time, the Tribe proposed that it would begin to share
9   revenue once its net revenues, less debt servicing and
10  infrastructure payments, exceeded $12 million per year.   Revenue
11  sharing obligations would be offset by the money the tribe paid for
12  other fees, such as fees to local government for associated
13  infrastructure.   Under this proposal, the tribe would continue to
14  receive RSTF payments until the $12 million cutoff.   This proposal
15  provided for geographic exclusivity within 100 miles.

16      **5.   The Parties' Fall 2007 Negotiations**

17  In August 2007, the State proposed a compact with some revenue
18  sharing at all net revenue levels, phasing out of RSTF payments,
19  exclusivity for 55 miles, and authorization of up to 349 devices.
20  (Houck Decl. Ex. Z.)   The day after receiving this proposal, the
21  Tribe responded by contending that it did not have to negotiate
22  revenue sharing and RSTF payments absent meaningful concessions.

23  The Tribe then counter-proposed a plan with no revenue
24  sharing, continued receipt of the full $1.1 million RSTF payments,
25  349 devices, and payments to the State only for mitigation of off-
26  reservation impacts.   The Tribe supported its proposal with a

1  "gaming market assessment," projecting future revenue under various

2  scenarios.  The Tribe asserted that this document showed that any

3  amount of revenue sharing would cause the Tribe to operate at a

4  loss.  The State rejected this proposal.

5      Fort Independence then filed the complaint in this action on

6  February 25, 2008.  The complaint alleged claims under the IGRA and

7  under the California and United States Equal Protection Clauses.

8  The court granted the State's motion for judgment on the pleadings

9  as to the Equal Protection claims by Order of September 10, 2008.

10 Pending before the court are cross motions for summary judgment on

11 the IGRA good faith claim.

12                            **II. STANDARD**

13     Each party has filed a motion styled as a motion for summary

14 judgment.  The Tribe asserts that the normal Fed. R. Civ. P. 56

15 standard applies, whereas the State does not discuss the standard

16 applicable to its motion.  Courts have varied in their handling of

17 motions to enforce IGRA's good faith obligation.  In Indian Gaming

18 Related Cases v. California, 147 F. Supp. 2d 1011, 1020-21 (N.D.

19 Cal. 2001) (Coyote Valley I), affirmed by Coyote Valley II, 331

20 F.3d 1094, the court considered a tribe's "motion for an order

21 requiring Defendant State of California to negotiate," which the

22 court resolved on the papers and after a hearing without discussion

23 of what standard applied.  147 F. Supp. 2d 1011, 1013.  The Ninth

24 Circuit affirmed denial of this motion without discussing the

25 posture of the case.  In its evaluation, the Ninth Circuit weighed

26 evidence, concluding that the evidence of good faith overcame the

                                  13

1  evidence of bad.

2      In contrast, in <u>Rincon Band of Luiseno Mission Indians of the</u>

3  <u>Rincon Reservation v. Schwarzenegger</u>, No. 04-cv-1151 (S.D. Cal.

4  April 29, 2008), (hereinafter <u>Rincon Band</u>) the court considered

5  cross motions for summary judgment.  The court recited the

6  standards applicable to such motions, and proceeding to resolve all

7  issues presented in that case.  That court's resolution of the

8  issues did not require weighing of evidence.

9      Here, where the parties label their motions as motions for

10 summary judgment, the court uses the ordinary standards applicable

11 to such motions, recognizing that this differs from the posture of

12 the <u>Coyote Valley</u> cases.

13     Summary judgment is appropriate when it is demonstrated that

14 there exists no genuine issue as to any material fact, and that the

15 moving party is entitled to judgment as a matter of law.  Fed. R.

16 Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157

17 (1970); <u>Poller v. Columbia Broadcast System</u>, 368 U.S. 464, 467

18 (1962); <u>Jung v. FMC Corp.</u>, 755 F.2d 708, 710 (9th Cir. 1985); <u>Loehr</u>

19 <u>v. Ventura County Community College Dist.</u>, 743 F.2d 1310, 1313 (9th

20 Cir. 1984).

21     Under summary judgment practice, the moving party

22         [A]lways bears the initial responsibility of
           informing the district court of the basis for
23         its motion, and identifying those portions of
           "the pleadings, depositions, answers to
24         interrogatories, and admissions on file,
           together with the affidavits, if any," which
25         it believes demonstrate the absence of a
           genuine issue of material fact.

26

14

1  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the

2  nonmoving party will bear the burden of proof at trial on a

3  dispositive issue, a summary judgment motion may properly be made

4  in reliance solely on the 'pleadings, depositions, answers to

5  interrogatories, and admissions on file.'"  Id.  Indeed, summary

6  judgment should be entered, after adequate time for discovery and

7  upon motion, against a party who fails to make a showing sufficient

8  to establish the existence of an element essential to that party's

9  case, and on which that party will bear the burden of proof at

10 trial.  Id. at 322.  "[A] complete failure of proof concerning an

11 essential element of the nonmoving party's case necessarily renders

12 all other facts immaterial."  Id.  In such a circumstance, summary

13 judgment should be granted, "so long as whatever is before the

14 district court demonstrates that the standard for entry of summary

15 judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

16     If the moving party meets its initial responsibility, the

17 burden then shifts to the opposing party to establish that a

18 genuine issue as to any material fact actually does exist.

19 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

20 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391

21 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d

22 1276, 1280 (9th Cir. 1979), cert. denied, 455 U.S. 951 (1980).

23     In attempting to establish the existence of this factual

24 dispute, the opposing party may not rely upon the denials of its

25 pleadings, but is required to tender evidence of specific facts in

26 the form of affidavits, and/or admissible discovery material, in

15

1    support of its contention that the dispute exists.   Rule 56(e);

2    Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at

3    289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).   The

4    opposing party must demonstrate that the fact in contention is

5    material, i.e., a fact that might affect the outcome of the suit

6    under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S.

7    242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec.

8    Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

9    dispute is genuine, i.e., the evidence is such that a reasonable

10   jury could return a verdict for the nonmoving party, Anderson, 242

11   U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

12   (9th Cir. 1987).

13       In the endeavor to establish the existence of a factual

14   dispute, the opposing party need not establish a material issue of

15   fact conclusively in its favor.   It is sufficient that "the claimed

16   factual dispute be shown to require a jury or judge to resolve the

17   parties' differing versions of the truth at trial."   First Nat'l

18   Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631.   Thus,

19   the "purpose of summary judgment is to 'pierce the pleadings and to

20   assess the proof in order to see whether there is a genuine need

21   for trial.'"   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P.

22   56(e) advisory committee's note on 1963 amendments); International

23   Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405

24   (9th Cir. 1985).

25       In resolving the summary judgment motion, the court examines

26   the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any.  Rule

56(c); <u>Poller</u>, 368 U.S. at 468; <u>SEC v. Seaboard Corp.</u>, 677 F.2d

1301, 1305-06 (9th Cir. 1982).  The evidence of the opposing party

is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable

inferences that may be drawn from the facts placed before the court

must be drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S.

at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655

(1962) (per curiam)); <u>Abramson v. Univ. of Haw.</u>, 594 F.2d 202, 208

(9th Cir. 1979).  Nevertheless, inferences are not drawn out of the

air, and it is the opposing party's obligation to produce a factual

predicate from which the inference may be drawn.  <u>Richards v.</u>

<u>Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

<u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party

"must do more than simply show that there is some metaphysical

doubt as to the material facts. . . . Where the record taken as a

whole could not lead a rational trier of fact to find for the

nonmoving party, there is no 'genuine issue for trial.'"

<u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

### III. ANALYSIS

The heart of this dispute is the State's request for revenue

sharing, and the tension between IGRA's apparent hostility to

revenue sharing and the prevalence of revenue sharing agreements.

The Tribe first argues that the State has insisted on

negotiating topics which are not those that "may" be included in

compacts under section 2710(d)(3)(C), and that mere negotiation of

these topics violates IGRA.  The court concludes that both unrestricted revenue sharing (when tied to exclusivity) and forfeiture of RSTF payments are issues that directly relate to gaming under section 2710(d)(3)(C)(vii), such that provisions relating to these issues "may" be included in compacts under section 2710(d)(3)(C).

Second, the Tribe argues that revenue sharing and forfeiture of RSTF payments are taxes which the state has impermissibly imposed or demanded in violation of sections 2710(d)(4) and (d)(7)(B)(iii)(II).  The court concludes that forfeiture of RSTF payments is not a tax, but that revenue sharing is, and that there is a triable question as to whether the state has offered a meaningful concession in exchange for the revenue sharing provisions.

Third and finally, the remaining evidence does not permit summary judgment as to good or bad faith.  The parties separately dispute whether the State has provided evidence sufficient to demonstrate its good faith.  Accordingly, the question regarding a meaningful concession is material, and the parties' motions must be denied.

**A.   Method of Statutory Interpretation**

Resolution of this case turns almost entirely on interpretation of IGRA.  The court is guided by the principles of deference to agency interpretation of statutes and of interpreting statutes passed for the benefit of tribes in a way that favors tribal interests.

1    The interpretation of statutes that are administered by

2  executive agencies, and concomitant judicial deference to agency

3  interpretation, has received significant recent attention from the

4  courts.  See, e.g., Barnhart v. Walton, 535 U.S. 212, 222 (2002),

5  United States v. Mead Corp., 533 U.S. 218, 230 (2001), Chevron

6  U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 842-45 (1984).

7  The cases have established a three step process for "Chevron"

8  interpretation.  Wilderness Soc'y v. United States FWS, 353 F.3d

9  1051, 1060 (9th Cir. 2003) (en banc), amended by 360 F.3d 1374

10 (2004).  First, the court must determine whether the statutory text

11 is ambiguous.   This determination is made with reference to

12 ordinary textual tools of interpretation.  For example, when making

13 this threshold determination,

14          "a reviewing court should not confine itself
            to examining a particular statutory provision
15          in isolation."  Rather, "[t]he meaning--or
            ambiguity--of certain words or phrases may
16          only become evident when placed in context. .
            . . It is a 'fundamental canon of statutory
17          construction that the words of a statute must
            be read in their context and with a view to
18          their place in the overall statutory scheme.'"

19 Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644

20 (2007) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S.

21 120, 132-33 (2000)) (internal citations omitted).   Second, if the

22 text is ambiguous, the court then determines whether the agency

23 interpretation is of a type entitled to deference under Chevron.

24 Mead Corp., 533 U.S. at 229-30.  If the agency interpretation is

25 entitled to Chevron deference, the third step is to determine

26 whether the agency interpretation is a reasonable interpretation of

1  the statute.   If so, the court adopts it.   If the agency
2  interpretation is not entitled to deference under <u>Chevron</u>, it may
3  nonetheless be entitled to a distinct form of deference under
4  <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944).  <u>See</u> <u>Marmolejo-Campos</u>
5  <u>v. Holder</u>, 558 F.3d 903, 909 (9th Cir. 2009) (en banc).

6      A second canon of interpretation is that statutes passed to
7  benefit Tribes should be interpreted in light of this purpose. <u>See,</u>
8  <u>e.g.,</u> <u>Montana v. Blackfeet Tribe</u>, 471 U.S. 759, 766 (1985).  When
9  <u>Chevron</u> deference is owed to an agency interpretation, however,
10 Ninth Circuit authority provides that <u>Chevron</u> deference trumps
11 application of the <u>Blackfeet</u> canon.  <u>Confederated Salish & Kootenai</u>
12 <u>Tribes v. United States</u>, 343 F.3d 1193, 1198 (9th Cir. 2003)
13 (citing <u>Blackfeet Tribe</u>, 471 U.S. at 766).  As discussed below, the
14 court need not decide whether this hierarchy applies when the
15 agency receives <u>Skidmore</u> deference.  <u>See</u> <u>Shields v. United States</u>,
16 698 F.2d 987, 991 (9th Cir. 1983).

17 **B.    Objections to Topics of Negotiation, § 2710(d)(3)(C)**

18     Section 2710(d)(3)(C) provides that compacts "may include
19 provisions relating to" a list of topics, including "subjects that
20 are directly related to the operation of gaming activities." §
21 2710(d)(3)(C)(vii).  The Tribe argues that both the discontinuation
22 of RSTF payments and the unrestricted revenue sharing provision
23 fall outside this list of topics.

24     As to RSTF payments, the Ninth Circuit has already held that
25 the RSTF program falls within section 2710(d)(3)(C)(vii).  <u>Coyote</u>
26 <u>Valley</u>, 331 F.3d at 1111.

> Congress sought through the IGRA to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments."  The RSTF provision advances this Congressional goal by creating a mechanism whereby *all* of California's tribes--not just those fortunate enough to have land located in populous or accessible areas--can benefit from class III gaming activities in the State.

Id. (quoting § 2701(1), emphasis in original).  Thus, this topic directly relates to gaming, and no further analysis is required.

The Tribe's arguments as to whether unrestricted revenue sharing is "directly related to" gaming raise novel issues regarding the effect of a topic's omission from the list of factors that "may" be included in compacts.  The State argues that the revenue sharing is "directly related to" gaming, and that the State may therefore insist upon inclusion of this provision.  The Tribe argues that the revenue sharing is not directly related to gaming, and that as a result, either the State cannot insist on negotiating this issue (although the Tribe may agree to do so) or that negotiation of this issue is prohibited.[7]

These three positions respectively correspond to the treatment of mandatory, permissive, and prohibited topics of negotiation recognized under the National Labor Relations Act.  See Retlaw Broadcasting Co. v. NLRB, 172 F.3d 660, 665 (9th Cir. 1999) (discussing these three categories); see also Coyote Valley I, 147 F. Supp. 2d at 1020-21 (cases interpreting the NLRA provide

_____

[7] During negotiations prior to the filing of this suit, the Tribe adopted only the former of these two interpretations.  See Def.'s Record of Negotiations Ex. Z, DD.

guidance in interpreting IGRA's good faith provisions, although NLRA caselaw cannot be applied "wholesale"). Under the NLRA, employers and employee representatives have an "obligation . . . to . . . confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). Courts interpreting this language have recognized a trichotomy of subjects. The subjects about which parties are obliged to confer are "mandatory" subjects. For these, a party may insist on its position relative to these provisions even if doing so leads to impasse. NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 350 (1958). In general, "all other subjects are permissive subjects." Retlaw Boardcasting, 172 F.3d at 665 (quotation omitted). "The parties may bargain collectively on permissive terms, but they are not required to do so." Id. Thus, a party may not "insist on a permissive subject to the point of impasse." Id. (citing Borg-Warner, 356 U.S. at 349). Third, in an exception to the general rule that all un-enumerated subjects are permissive, subjects "proscribed by federal or, where appropriately applied, state law" are prohibited subjects that may not be negotiated. Idaho Statesman v. NLRB, 836 F.2d 1396, 1400 (D.C. Cir. 1988). For example, the NLRA provides that a contract to boycott another employer is unenforceable. NLRA § 8(e), 29 U.S.C. § 158(e). Parties are therefore prohibited from negotiating this topic.

Returning to the IGRA, as explained below, this court concludes that topics other than those enumerated by section 2710(d)(3)(C) are prohibited topics of negotiation. Enumerated

1  topics may be mandatory or permissive. Accordingly, if

2  unrestricted revenue sharing did not directly relate to gaming,

3  then negotiation of it would be strong, if not determinative,

4  evidence of bad faith.[8]   The court concludes, however, that

5  unrestricted revenue sharing directly relates to gaming within the

6  meaning of 2710(d)(3)(C)(vii).

7      **1.  Under Section 2710(d)(3)(C), Negotiation of Topics Not**

8         **Enumerated Is Prohibited**

9      The statutory text of section 2710(d)(3)(C) sharply differs

10  from the NLRA.  The NLRA enumerates topics for which parties have

11  an "obligation . . . to . . . confer," 29 U.S.C. § 158(d).  The

12  IGRA, in contrast, enumerates topics that "may" be included in

13  compacts, and by extension, that may be negotiated.  §

14  2710(d)(3)(C).  Under the *inclusio unius est exclusio alterius*

15  canon of construction, both lists are presumed to be exhaustive.

16  See, e.g., United States v. 4,432 Mastercases of Cigarettes, 448

17  F.3d 1168, 1190 (9th Cir. 2006).  Thus, while topics not enumerated

18  by NLRA are merely topics for which the parties have no obligation

19  to negotiate (i.e., permissive or prohibited topics), topics not

20  enumerated by IGRA are ones which the parties may not negotiate

21  (i.e., prohibited topics).  The statute is not ambiguous in this

22  regard.

23  ────────

24     [8] Because the court decides that the provisions negotiated here are within section 2710(d)(3)(C), the court does not decide

25  whether unilateral efforts to negotiate a provision outside the scope of this section would constitute bad faith per se, or whether

26  such efforts would merely be evidence of bad faith to be weighed against other evidence.

1    In <u>Seminole Tribe</u>, the Supreme Court stated that "§ 2710(d)(3)

2    . . . describes the permissible scope of a Tribal-State compact,"

3    implying that provisions outside of this section were prohibited.

4    517 U.S. at 49.   Similarly, <u>Coyote Valley II</u> concluded that the

5    three compact provisions at issue were within section (d)(3)(C),

6    implying that they would have been prohibited if they were not

7    without stating this point directly.   331 F.3d at 1111, 1114.   <u>See</u>

8    <u>also</u> <u>Wisconsin v. Ho-Chunk Nation</u>, 512 F.3d 921, 933 (7th Cir.

9    2008).[9]   These interpretations, while dicta, support the court's

10   conclusion, and the court is not aware of any opinion squarely

11   addressing the issue.

12   Although the court holds that "may" as used in this section is

13   unambiguous, such that further inquiry is not required, the court

14   notes that this interpretation is consistent with both the

15   legislative history of IGRA and the Department of the Interior's

16   interpretations and implementation of the statute.   According to

17   the Senate's Select Committee on Indian Affairs' report, section

18   2710(d)(3)(C) "describes the issues that may be the subject of

19   negotiations between a tribe and a State in reaching a compact. .

20

21        [9] <u>But see</u> <u>Coyote Valley I</u>, 147 F. Supp. 2d at 1018.   In <u>Coyote</u>
     <u>Valley I</u> the district court stated that a "State cannot insist that
22   compacts include provisions addressing subjects that are only
     indirectly related to the operation of gaming facilities."   <u>Id.</u>
23   This statement might imply that such topics are permissive, rather
     than prohibited.   However, even if the court intended this
24   implication, the implication was dicta in that the court concluded
     that it was not confronted with such a provision.   Although this
25   court concludes otherwise, as with so many issues in this case, the
     rejected position is not without substance and weight.
26

1  . . . The Committee does not intend that compacts be used as a

2  subterfuge for imposing State jurisdiction on tribal lands." S.

3  Rep. 100-446, *14-15 (Aug. 3, 1988). In like manner, the

4  Department of Interior has held that section 2710(d)(3)(C) "limits

5  the proper topics for compact negotiations to those that bear a

6  direct relationship to the operation of gaming activities." Letter

7  from Principal Deputy Assistant Secretary of Indian Affiars to

8  Kenneth Blanchard, Governor, Absentee Shawnee Tribe of Oklahoma

9  (Dec. 17, 2004) (approving in part the Shawnee-Oklahoma Compact).[10]

10  The Department of Interior has enforced this limitation by

11  rejecting a compact provision that would terminate the gaming

12  compact in the event that the Tribe materially breached the terms

13  of a separate tobacco compact, concluding that even though the

14  Tribe and State had agreed to this provision, it violated section

15  2710(d)(3)(C). Id.

16      Thus, the court concludes that parties may not negotiate

17  topics other than those enumerated by IGRA. Turning to those that

18  are enumerated, all such topics may be negotiated without violating

19  section 2710(d)(3)(C). Moreover, a party may in at least some

20  instances insist on its position with respect to negotiation of

21  these topics. Coyote Valley II, 331 F.3d at 1111 ("the State did

22  not lack good faith when it _insisted_ that Coyote Valley adopt [the

23  _____

24      [10]   This letter is attached as Plaintiff's Request for
    Judicial Notice Exhibit 1. Exhibit 2 to plaintiff's request for
    judicial notice is a Letter from the Acting Assistant Secretary of

25  Indian Affairs to Janet Napolitano, Governor of the State of
    Arizona (January 24, 2003), approving a compact in full. Judicial

26  notice of both letters is proper.

1   RSTF provision] as a precondition for entering a Tribal-State

2   compact.") (emphasis added), id. at 1114 ("the State's insistence

3   on" the Special Distribution Fund was permissible).  The panel in

4   Coyote Valley II did not explicitly state that it used "insist" in

5   the sense used under the NLRA, namely, bargaining to impasse.  The

6   facts of that case, however, indicate that this is what occurred.

7   Such insistence is not always permissible, as demonstrated by the

8   panel's treatment of sections 2710(d)(4) and (d)(7)(B)(iii)(II),

9   discussed below.  Here, the court merely notes that the topics

10  enumerated by section 2710(d)(3)(C) are either permissive or

11  mandatory as those terms are used under the NLRA.

12      **2.   Unrestricted Revenue Sharing and § 2710(d)(3)(C)(vii)**

13      Pursuant to the above analysis, if unrestricted revenue

14  sharing provisions do not directly relate to gaming or otherwise

15  fall within section 2710(d)(3)(C), then such provisions violate

16  IGRA and are prohibited.  The court concludes that phrase "directly

17  related to . . . gaming" is ambiguous and that the Department of

18  the Interior's interpretation of the phrase is not entitled to

19  Chevron deference.  Nonetheless, Skidmore deference to the agency,

20  the Blackfeet Tribe canon, and the ordinary tools of statutory

21  interpretation together compel the conclusion that unrestricted

22  revenue sharing provisions that are tied to exclusivity provisions

23  directly relate to gaming within the meaning of section

24  2710(d)(3)(C)(vii).

25      **a.   Section 2710(d)(3)(C)(vii) Is Ambiguous**

26      The only subsection of section 2710(d)(3)(C) potentially

26

encompassing unrestricted revenue sharing is subsection (vii), a catch-all provision for "any other subjects that are directly related to the operation of gaming activities."  As explained above, in Coyote Valley II, the Ninth Circuit held that both the RSTF and Special Distribution Funds provision of the 1999 Compacts directly related to gaming.  The Ninth Circuit's analysis focused primarily on the uses to which the funds would be put.  331 F.3d at 1111.  This relationship is absent here, where the funds may be used for any purpose.  No circuit court has ruled on the lawfulness of an unrestricted revenue sharing provision, and this court is not aware of an district court opinion ruling on this issue.  See Wisconsin v. Ho-Chunk Nation, 512 F.3d 921, 932 (7th Cir. 2008) (concluding that the validity of a revenue sharing provision was not before it, but noting that as of mid 2008, no Circuit decision other than Coyote Valley II had addressed revenue-sharing).  As the court understands the issue, there are four other potential relationships between revenue sharing and gaming activity.  Three of these are plainly outside the scope of the statute, but the statute is unclear as to whether the fourth relationship is "direct."

     The State argues that revenue sharing directly relates to gaming because it provides an incentive to the State to negotiate and enter compacts on terms that are otherwise favorable to Tribes.  According to this argument, revenue sharing provisions thereby increase the amount of gaming that will be conducted, and further the Tribe's ability to profit from gaming.  Revenue sharing

1   provisions may in fact have this effect. Nonetheless, the statute

2   cannot be read to encompass this type of relationship. Every

3   conceivable compact provision will affect either the State's or the

4   Tribe's willingness to enter the compact. If this incentivizing

5   effect was sufficient to constitute a "direct relationship" to

6   gaming, then every conceivable provision would satisfy section

7   2710(d)(3)(C)(vii). The court cannot accept this construction of

8   the statute, because it renders a restrictive term a nullity. "[A]

9   statute should be construed so that effect is given to all its

10  provisions, so that no part will be inoperative or superfluous,

11  void or insignificant." Corley v. United States, ___ U.S. ___,

12  ___, 129 S. Ct. 1558, 1563 (2009) (quoting Hibbs v. Winn, 542 U.S.

13  88, 101 (2004)) (internal quotation marks omitted).

14      A more obvious relationship between revenue sharing and gaming

15  is that the revenue comes from gaming. When the statute is read as

16  a whole, however, it is clear that this fact does not bring revenue

17  sharing within the scope of section 2710(d)(3)(C)(vii). See Dolan

18  v. United States Postal Serv., 546 U.S. 481, 485 (2006)

19  ("Interpretation of a word or phrase depends upon reading the whole

20  statutory text, considering the purpose and context of the statute,

21  . . . ."). Subsection (iii) provides that compacts may include

22  "assessments," a form of revenue sharing, tied to "defray[ment of]

23  the costs of regulating [gaming] activity." § 2710(d)(3)(C)(iii).

24  If all revenue sharing was permitted under subsection (vii), there

25  would be no need for subsection (iii) to permit a specific form of

26  revenue sharing. In addition, IGRA's general hostility to

28

taxation, §§ 2710(d)(4), (d)(7)(b)(iii)(II), indicates that this relationship is not the type envisioned by (d)(3)(C)(vii).[11]

Finally, revenue sharing is related to gaming in that gaming is related to tribal exclusivity, and tribal exclusivity is purportedly related to revenue sharing.[12]  The relationship between gaming and exclusivity is clearly direct.  "Gaming activity" may refer to all gaming, or only to gaming on tribal lands.  If it is the former, then prohibition of non-tribal gaming directly relates to gaming activity.  If it is the later, then exclusivity still relates to tribal gaming in that exclusivity makes tribal gaming substantially more profitable.  This relationship, although slightly attenuated, is nonetheless as direct as the relationships

---

[11]   The court further notes that in Coyote Valley II, both the RSTF and Special Distribution Fund provisions involved funding derived directly from gaming revenues, but the Ninth Circuit rested its conclusion that these provisions directly related to gaming on other factors.

The only possible exception to this characterization of Coyote Valley II consists of one unexplained sentence in which the panel stated that the RSTF program acted "in a manner directly related to the operation of gaming activities." Coyote Valley II, 331 F.3d at 1111.  One reading of this sentence is that the "manner" of the RSTF's operation is as a license on individual gaming devices, such that a license of that kind is "directly related to gaming activities."  This reading is belied by the remainder of the panel's opinion, which is inconsistent with the conclusion that a per-device licensing fee is itself directly related to gaming operations.

Although the panel's general silence as to the significance of the fact that revenue for the RSTF and SDF provisions came from gaming does not establish that the factor is irrelevant, the court notes that the analysis here is consistent with the panel's opinion in Coyote Valley II.

[12]   To again refer to Coyote Valley II, this is another relationship that was present in that case but that was not discussed by the Ninth Circuit panel.

approved by the Ninth Circuit in <u>Coyote Valley II</u>. Thus, exclusivity directly relates to gaming activity, and the court need not resolve any ambiguity as to the meaning of "gaming activity."[13]

The second step is the relationship between exclusivity and revenue sharing. There are two such relationships. The first is the fact that in negotiations, exclusivity was offered in exchange for revenue sharing. The fact that one provision directly relates to gaming cannot mean that any other provision that is offered in exchange also directly relates to gaming, because this would eviscerate the prohibition imposed by section 2710(d)(3)(C). That is, such a construction would allow any provision to be included in a compact simply by connecting it to a permissible provision during negotiations.

Here, however, exclusivity and revenue sharing are related by more than the fact that in negotiation one is offered in exchange for the other. Exclusivity causes the state to forgo revenue that could have been raised by taxing non-tribal gaming, and the revenue sharing provision purportedly offsets this loss of revenue.[14] The

---

[13] It appears that the broader interpretation is more likely. Although the statute is primarily concerned with tribal gaming, other provisions in the statute use the phrase "class III gaming activity on Indian lands." <u>See, e.g.</u>, §§ 2710(d)(1), (d)(2)(A), (d)(2)(C). If "gaming activity" always meant tribal gaming, these other provisions would not need to specifically refer to gaming on Indian lands.

[14] Although this is the apparent justification, the court is not aware of any attempt, by the parties to this case or elsewhere, to quantify the amount of non-tribal gaming revenue foregone by the State.
    Payments into the RSTF obviously do not serve to replace the State's forgone revenue, because the RSTF transfers money to other

1  court cannot conclude that the text of the statute unambiguously

2  indicates that this final relationship is direct or indirect.

3  Unlike the other relationships considered above, the statutory

4  context does not clearly exclude this type of relationship.  Absent

5  a blanket exclusion, the statute does not provide a clear answer as

6  to how attenuated a relationship may be while still being direct.

7  The Ninth Circuit's interpretation of the statutory text in <u>Coyote</u>

8  <u>Valley II</u> does not resolve this ambiguity.   On one hand,

9  unrestricted revenue sharing is less directly related to gaming

10 than are the SDF and labor provisions accepted by <u>Coyote Valley II</u>.

11 Those provisions involved collecting funds for payment of costs

12 incurred by gaming itself, and for rights of workers employed by

13 gaming facilities.   331 F.3d at 1114, 1116.   On the other hand,

14 revenue sharing to offset revenue lost through exclusivity is not

15 obviously less directly related to gaming than the RSTF provision,

16 which is related to gaming in that it reallocates funds raised by

17 gaming in a manner that effectuates IGRA's purpose.   <u>Id.</u> at 1111.

18 Although revenue sharing and exclusivity have a less obvious

19 connection to the statute's purpose, the connection to gaming

20 itself is comparable, and the Ninth Circuit neither implied nor

21 concluded that only provisions that further the statute's primary

22 purpose suffice.   Accordingly, the statutory text is ambiguous as

23

24 tribes rather than to the State.   However, as explained in <u>Coyote</u>
   <u>Valley II</u> and noted above, the Ninth Circuit has already determined
25 that the RSTF program directly relates to gaming.   Accordingly, the
   fact that RSTF payments do not replace revenue forgone by
26 exclusivity is not pertinent.

31

1  to whether revenue sharing, when offered in connection with
2  exclusivity, is directly related to gaming operations.  The court
3  therefore turns to the next step in the <u>Chevron</u> analysis.

4           **b.    The Agency Interpretation Is Not Entitled to**
5                **Deference  Under  <u>Chevron</u>**

6          Once it is determined that a statute is ambiguous, the court
7  must determine whether an agency's interpretation of the statute is
8  entitled to deference under <u>Chevron</u>.  In <u>Mead</u>, the Supreme Court
9  established  that  an  agency  interpretation  receives
10 <u>Chevron</u> deference only when (1) it is reasonable to believe that
11 "Congress delegated authority to the agency generally to make rules
12 carrying the force of law," and (2) "the agency interpretation
13 claiming  deference  was  promulgated  in  the  exercise  of  that
14 authority."  <u>Mead</u>, 533 U.S. at 226-27; <u>see also</u> <u>Marmolejo-Campos</u>,
15 558 F.3d at 908.  In interpreting <u>Mead</u>, the Ninth Circuit has held
16 that an interpretation has the force of law only when it has a
17 precedential effect that binds third parties.  "[T]he precedential
18 value of an agency action [is] *the* essential factor in determining
19 whether <u>Chevron</u> deference is appropriate." <u>Marmolejo-Campos</u>, 558
20 F.3d at 909 (quoting <u>Alvarado v. Gonzales</u>, 449 F.3d 915, 922 (9th
21 Cir. 2006)) (emphasis in original).  The Ninth Circuit has
22 repeatedly applied this rule.  In considering the Bureau of
23 Immigration  Appeals'  affirmation  of  an  immigration  judge's
24 interpretation of the phrase "paroled into the United States" in 8
25 U.S.C.  §  1255,  the  Ninth  Circuit  declined  to  extend
26 <u>Chevron</u> deference "'[b]ecause the BIA's decision was an unpublished

disposition, issued by a single member of the BIA, which does not bind third parties.'" Ortega-Cervantes v. Gonzales, 501 F.3d 1111, 1113 (9th Cir. 2007) (quoting Garcia-Quintero v. Gonzales, 455 F.3d 1006, 1012 (9th Cir. 2006)).  Although the BIA has the authority to establish binding precedent through case-by-case adjudication, the unpublished, single-member decision was not an exercise of that authority.  Garcia-Quintero, 455 F.3d at 1012; see also 8 C.F.R. § 1003.1(e) (specifying that such decisions are non-precedential). Similarly, the Ninth Circuit has held that the U.S. Fish and Wildlife Service's decision to issue a permit to operate a project in a wilderness area did not "'bespeak the legislative type of activity that would naturally bind more than the parties to the ruling,'" and was not entitled to Chevron deference.  Wilderness Soc'y, 353 F.3d at 1067 (quoting Mead, 533 U.S. at 232).  See also High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 648 (9th Cir. 2004).[15]

---

[15] Ninth Circuit cases provide less discussion of the Supreme Court's decision in Barnhart v. Walton, 535 U.S. 212 (2002), decided subsequent to Mead.  In Barnhart, the Court deferred to an interpretation of the Social Security Act contained in a regulation promulgated by the Social Security Administration.  Id. at 214. The Court held that whether an interpretation was adopted after notice-and-comment rulemaking was not dispositive, and that the agency's interpretation was entitled to deference because of "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time."  Id. at 222.  Although the interpretation under consideration in Barnhart was binding on third parties, in that it was enacted in a regulation, the Court did not discuss the significance of this factor.  Subsequently decided Ninth Circuit cases compel this court to conclude that even if the Barnhart factors are met, an interpretation receives Chevron deference only

1    The Department of the Interior interprets IGRA when it is

2   presented with a compact for approval.  In some cases, the agency's

3   approval has been accompanied by an explicit interpretation of

4   section 2710(d)(3)(C).  For example, the agency rejected a gaming

5   compact provision that would trigger nullification of a separate

6   tobacco compact.  Letter from Principal Deputy Assistant Secretary

7   of Indian Affairs to Kenneth Blanchard, Governor, Absentee Shawnee

8   Tribe of Oklahoma (Dec. 17, 2004).  This court is not aware of any

9   explicit interpretation of section 2710(d)(3)(C)(vii) as it

10  specifically applies to revenue sharing.  However, the Secretary

11  has repeatedly approved compacts that contain exclusivity and

12  revenue sharing provisions, in California and elsewhere.[16]  By so

13  doing, the agency has implicitly concluded that revenue sharing is

14  consistent with IGRA, and thus with section 2710(d)(3)(C)(vii).

15

16  if it binds third parties.  <u>Marmolejo-Campos</u>, 558 F.3d at 909.

17       [16] For example, see the compacts between California and the
    Yurok Tribe and the Coyote Valley Band of Pomo Indians.  The
18  notices of the Secretary's approval of these compacts are published
    at 72 Fed. Reg. 62264-01 and 69 Fed. Reg. 76004, respectively. The
19  c o m p a c t s   t h e m s e l v e s   a r e   a v a i l a b l e   a t
    http://www.cgcc.ca.gov/compacts/yurok_2006_compact.pdf   and
20  http://www.cgcc.ca.gov/compacts/coyote_valley%20Compact.pdf.  In
    each compact, the revenue sharing agreement is codified at section
21  4.3.1.
         The Secretary has also approved compacts providing for
22  unrestricted revenue sharing in New York, Massachusetts,
    Connecticut, and New Mexico.  <u>See, e.g.</u>, <u>Pueblo of Sandia v.</u>
23  <u>Babbitt</u>, 47 F. Supp. 2d 49, 52 (D.D.C. 1999) (concerning compact
    negotiated with New Mexico); <u>see also</u> <u>Coyote Valley II</u>, 331 F.3d
24  at 1115 n.17 (noting that Connecticut, New Mexico and New York have
    entered compacts containing such provisions) (citing Gatsby
25  Contreras, <u>Exclusivity Agreements in Tribal-State Compacts: Mutual</u>
    <u>Benefit Revenue-Sharing or Illegal State Taxation?</u>, 5 J. Gender
26  Race & Just. 487, 494-507 (2002)).

1   Indeed, the agency has demonstrated that it will reject compacts

2   that it determines violate this provision.

3        The Department of Interior's decisions to approve individual

4   State-Tribal Gaming Compacts appear not to have a precedential

5   effect that binds third parties, although the parties have not

6   briefed this issue.  The Department's approvals result from a

7   relatively informal procedure, under which the State and Tribe

8   submit a copy of the compact and documents indicating their

9   approval thereof to the Secretary, who notifies the parties in

10  writing of his decision within 45 days.  25 C.F.R. §§ 293.8 -

11  293.14.  Formality of procedures is not determinative, but it is

12  one indication that an interpretation has the force of law.  Mead,

13  533 U.S. at 230.  In addition, nothing indicates that the agency's

14  approval of one compact establishes a precedent that binds the

15  agency in future cases, and thus also binds third parties.

16  Instead, the agency is apparently able to change its interpretation

17  of IGRA, subject to the ordinary restraints on agency action.

18  Thus, the court concludes that the agency's approval of individual

19  compacts, and the implicit interpretation of section 2710(d)(3)(C)

20  as applied to revenue sharing contained therein, does not bind

21  third parties, and is therefore not entitled to deference under

22  Chevron.  Marmolejo-Campos, 558 F.3d at 909.

23            c.   **Interpreting IGRA under Skidmore and Blackfeet Tribe**

24       Because the statutory text is ambiguous and the agency

25  interpretation is not entitled to Chevron deference, the court must

26  itself resolve the ambiguity in the statute.  Here, the court is

primarily guided by two canons of interpretation.  Although the
agency interpretation is not entitled to deference under _Chevron_,
the court finds deference to be appropriate under _Skidmore_.  And
because IGRA was enacted in part to benefit tribes, the _Blackfeet_
_Tribe_ canon directs the court to interpret IGRA in a manner
consistent with that purpose.  Here, the court concludes that the
_Blackfeet_ canon does not squarely support either interpretation,
and the court thereby adopts the Department of Interior's position,
concluding that unrestricted revenue sharing tied to exclusivity
arrangements directly relates to gaming activities.

While _Chevron_ deference takes its force from an assumed
Congressional delegation of authority to the agency, _Skidmore_
deference reflects the fact that the agency has experience with the
statute and is likely to reach a reasoned interpretation regardless
of whether Congress intended the agency's interpretation to be
binding.  _Mead_, 533 U.S. at 230.  In contrast with _Chevron_
deference, _Skidmore_ deference is not all-or-nothing.  "The weight
[accorded to an administrative] judgment in a particular case will
depend upon the thoroughness evident in its consideration, the
validity of its reasoning, its consistency with earlier and later
pronouncements, and all those factors which give it power to
persuade, if lacking power to control." _Skidmore_, 323 U.S. at 140.

In this case, the agency has not provided a detailed
explanation of its interpretation.  Nonetheless, the interpretation
embodied by the approvals is longstanding, and has been frequently
and consistently applied.  Congress is undoubtedly aware of this

interpretation, yet it has not chosen to revisit IGRA.  These facts weigh heavily in favor of deference.  This court must also acknowledge the extremely disruptive effect that would result from a finding to the contrary.  Finally, as discussed above, the agency's interpretation of the statute is plausible.  Accordingly, the agency's interpretation of whether section 2710(d)(3)(C) encompasses unrestricted revenue sharing provisions connected to exclusivity is entitled to deference under <u>Skidmore</u>.  <u>See also</u> <u>Artichoke Joe's California Grand Casino v. Norton</u>, 216 F. Supp. 2d 1084, 1126-27 (E.D. Cal. 2002) <u>aff'd by</u> 353 F.3d 712, 730 (9th Cir. 2003).

The <u>Blackfeet</u> canon directs courts to interpret ambiguity in statutes passed for tribes' benefit in a way that favors tribes. Here, the Tribe argues that this canon should cause the court to reject the agency's interpretation.  Although the Tribe here argues that a prohibition on revenue sharing is in its interest, the issue is the interest of tribes generally.  <u>Coyote Valley II</u>, 331 F.3d at 1111.  These interests are unclear.  When IGRA was drafted, Congress concluded that States were in a position of superior bargaining power. S. Rep. 100-446, *14-15.  Limiting the scope of permissible negotiations is an apparent aspect of Congress's attempt to prevent States from exploiting this power.  Thus, Congress may have concluded that it was in tribes' interests to interpret section 2710(d)(3)(C) narrowly.  However, the Supreme Court's decision that IGRA did not abrogate states' sovereign immunity leaves the tribes' interests less clear.  <u>Seminole Tribe</u>,

1   517 U.S. at 47.   In other states, sovereign immunity has not been

2   waived, and tribes therefore cannot sue to enforce states'

3   obligation to negotiate under IGRA.   <u>See</u> <u>Pueblo of Sandia v.</u>

4   <u>Babbitt</u>, 47 F. Supp. 2d 49, 51 (D.D.C. 1999).   Some tribes have

5   used revenue-sharing agreements to entice non-waiving and

6   recalcitrant states into negotiations.   <u>Id.</u>   Concluding that

7   revenue sharing provisions are not directly related to gaming

8   activities, and that revenue sharing is therefore prohibited, would

9   eliminate one of the only tools these tribes have to encourage

10  states to negotiate compacts.   Accordingly, it is not at all clear

11  that a statutory prohibition on unrestricted revenue sharing would

12  provide the greatest benefit to tribes generally.

13      Because the <u>Blackfeet</u> canon has no clear application here, the

14  court need not decide the relationship between the <u>Blackfeet</u> canon

15  and <u>Skidmore</u> deference.[17]   The court defers under <u>Skidmore</u> to the

16  Department of Interior's longstanding and consistent, albeit

17  implicit, interpretation of the statute.   When an unrestricted

18  revenue sharing provision is tied to an exclusivity provision, the

19  revenue sharing is "directly related" to gaming activities, and

20

21      [17]   The Ninth has held that <u>Chevron</u> deference, when
    appropriate, precludes application of the <u>Blackfeet</u> canon.   <u>See,</u>
22  <u>e.g.</u>, <u>Williams v. Babbitt</u>, 115 F.3d 657, 663, n.5 (9th Cir. 1997).
    Although no case has specifically discussed whether
23  <u>Skidmore</u> deference is similarly overriding, several cases decided
    prior to <u>Chevron</u> held, without citing <u>Skidmore</u>, that similar forms
24  of agency deference precluded application of the canon favoring
    tribes.   <u>Shields v. United States</u>, 698 F.2d 987, 991 (9th Cir.
25  1983) (quoting <u>Assiniboine & Sioux Tribes v. Nordwick</u>, 378 F.2d 426
    (9th Cir. 1967)).   The court does not express an opinion on this
26  issue, other than to note that it, like many other issues in this
    case, is unclear.

                                    38

therefore within the scope of section 2710(d)(3)(C)(vii).  Candor requires the court to acknowledge that there are strong arguments supporting contrary interpretations of this section.  Nevertheless, the court holds that the State's efforts to negotiate this topic did not violate section 2710(d)(3)(C).

**B.    Fee Demands and Meaningful Concessions**

The Tribe next argues that the State's conduct amounts to either an "imposition" of or a "demand for" a tax.  Under section 2710(d)(3)(C)(iii), a state may tax gaming "in such amounts as are necessary to defray the costs of regulating such activity."  Section 2710(d)(4) provides that aside from such taxes, IGRA does not provide States with "authority to impose any tax, fee, charge, or other assessment," and "[n]o State may refuse to enter into . . . . negotiations . . . . based on the lack of [such] authority."  Section 2710(d)(7)(b)(iii)(II)  provides that a "demand . . . for direct taxation" is "evidence" of bad faith.  A compact provision can violate these sections even if it falls within section 2710(d)(3)(C).  Coyote Valley II, 331 F.3d at 1112.

IGRA does not define "impose" and "demand."  In ordinary usage, the terms connote difference contexts.  Imposition refers to a state acting unilaterally, and compelling a tribe to pay a tax.  Demand, on the other hand, refers to behavior during bilateral negotiation.  Rather than a compulsion, a demand is insistence on acceptance.

As the Ninth Circuit has interpreted the terms, they are functionally equivalent.  Without explicitly defining "imposition",

1   Coyote Valley II explained what it was not.  Where a state "offers
2   meaningful concessions in return for fee demands, it does not
3   exercise 'authority to impose' anything."  Coyote Valley II, 331
4   F.3d at 1112.  Even when "the State[] insist[s] on" a tribe's
5   acceptance of a fee in exchange for a meaningful concession offered
6   by the State, the State does not "impose" a fee.  Id. at 1114.  The
7   Secretary of the Interior apparently concludes that a State imposes
8   a fee whenever a compact includes a fee which is not offset by a
9   meaningful concession.  Letter from the Principal Deputy Assistant
10  Secretary of Indian Affairs to Kenneth Blanchard, Governor of the
11  Absentee Shawnee Tribe of Oklahoma (December 17, 2004).  Coyote
12  Valley II indicated that imposition of a fee is bad faith per se.
13  When a concession is inadequate, insistence on a fee might "amount
14  to an attempt to 'impose' a fee, and *therefore amount to bad faith*
15  *on the part of a State.*"  Coyote Valley II, 331 F.3d at 1112
16  (emphasis added).

17       A "demand" for a fee, on the other hand, is merely evidence of
18  bad faith, and this evidence may be outweighed by evidence of good
19  faith.  Coyote Valley II illustrated this distinction by assuming
20  that the State had demanded a fee even though the State did not
21  impose one, only to hold that any evidence of bad faith was
22  outweighed by evidence of good faith.  Id. at 1114.[18]  Despite this

23  _____

24       [18] The court explicitly refrained from deciding whether the
     state had in fact made a demand for a direct tax.  Coyote Valley
25   II, 331 F.3d at 1114.  Instead, the court held that, assuming that
     the requested revenue sharing and RSTF provisions were such
26   demands, the resulting evidence of bad faith was overcome by
     evidence of good faith.  Id.

distinction, the evidence of good faith and the evidence of a
meaningful concession were largely one and the same. The first
evidence of good faith with respect to the demand for revenue
sharing was that "the tribes receive . . . an exclusive right to
conduct class III gaming in the most populous State in the
country," which the court had earlier identified as a meaningful
concession. The second piece of evidence was that "the terms of
the compact restrict what the State can do with the money it
receives from the tribes pursuant to the [revenue sharing]
provision, and all of the purposes to which the money can be put
are directly related to gaming." This language merely reiterates
Coyote Valley II's analysis of section 2710(d)(3)(C).[19]    As
explained above, this court concludes that revenue sharing directly
relates to gaming when it is tied to an exclusivity provision.

     The effect of Coyote Valley II's analysis is that, at least
with respect to revenue sharing, the existence of a meaningful
concession, together with compliance with section 2710(d)(3)(C), is
sufficient to determine both whether a fee is imposed and whether

_____

     [19] In the separate discussion of the RSTF provision, Coyote
Valley II found additional evidence of good faith in the facts that
the RSTF "provision does not put tribal money into the pocket of
the State," that the RSTF provision was included at the behest of
the tribes, and that Coyote Valley tribe had had an opportunity to
participate in the negotiations giving rise to the RSTF provision.
331 F.3d at 1113. Because these factors were not present with
respect to the revenue sharing provision, id. at 1114-15, it is
clear that these factors are not necessary for a finding of good
faith.

41

1   the fee demand is itself proof of bad faith.[20]

2       Despite reaching this conclusion, the court notes that as with

3   many other issues in this case, the relationship between sections

4   2719(d)(4) and (d)(7)(B)(iii)(II) presents a difficult and largely

5   novel question.  The court responds to two potential concerns.

6   <u>Coyote Valley II</u> explained, in reference to the weighing of

7   evidence of good and bad faith under section (d)(7)(B)(iii)(II),

8   that "the good faith inquiry is nuanced and fact-specific, and not

9   amenable to bright-line rules."  331 F.3d at 1113.  Here, the court

10  adopts the rule that a demand for a tax is not sufficient to

11  demonstrate bad faith when the demand comports with section

12  2710(d)(3)(C) and the state offers a meaningful concession.  This

13  rule comports with <u>Coyote Valley II</u> because, as illustrated below,

14  the question of whether a meaningful concession has been offered is

15  itself "nuanced and fact specific," and because the broader good

16  faith inquiry, in which the tribe may introduce evidence other than

17  the demand for a tax, lies outside the scope of this rule.

18      A second concern is that treating imposition and demand as

19  near-equivalents renders one statutory provision surplusage.

20  However, the two provisions use different language for different

21  purposes.  Section 2710(d)(7)(B)(iii)(II) explains that certain

22  negotiating behavior indicates bad faith, whereas section

23

24      [20] It should go without saying that even when the State offers
    a meaningful concession and negotiates topics permitted by section
25  2710(d)(3)(C), other factors, beyond a demand for a tax, may
    nonetheless demonstrate bad faith.  For example, a state may act
    in bad faith by engaging solely in "surface bargaining," as
26  discussed in part III(C), below.

1  2710(d)(4) explains that the State has no power outside of its

2  power in negotiation.

3        Having laid this groundwork, the court turns to the facts of

4  this case.  As explained in the following sections, the court

5  concludes that surrender of the right to receive RSTF payments is

6  not a "tax, fee, charge, or other assessment," within the meaning

7  of section 2710(d)(4) or a "direct tax" within the meaning of

8  section 2710(d)(7)(B)(iii)(II).  Unrestricted revenue sharing is

9  such a tax, and the State's offer of exclusivity is a concession,

10  but a triable question remains as to whether this concession is

11  meaningful.

12        **1.    Forfeiting Receipt of RSTF Payments Is Not A Tax**

13        The Tribe argues that the forfeiture of the right to receive

14  payments from the RSTF, or diminution of those payments, is a "tax,

15  fee, charge, or other assessment" within the meaning of section

16  2710(d)(4).  Neither party has provided any authority on this

17  issue.

18        In ordinary English, a tax, charge, fee or assessment is an

19  obligation to pay out money that one already has.  Webster's

20  Dictionary provides the following pertinent definitions:

21            Charge: 5 a : expense, cost <gave the banquet
             at his own charge> b : the price demanded for
22            something <no admission charge> c : a debit to
             an account <the purchase was a charge>

23
             Fee: 2 a : a fixed charge b : a sum paid or
24            charged for a service

25            Tax: 1 a : a charge usually of money imposed
             by authority on persons or property for public
26            purposes b : a sum levied on members of an

43

1             organization to defray expenses

2   Merriam-Webster Online Dictionary (2009). Retrieved November 19,

3   2009, from http://www.merriam-webster.com/dictionary/. The Tribe's

4   apparent contention is that, notwithstanding the ordinary usage,

5   there is no bottom line difference between a "debit" to an account

6   and withholding of a deposit.  The caselaw has distinguished taxes

7   from penalties, debts, fees, and other charges, but the court is

8   not aware of any authority addressing the antecedent question of

9   whether something is a charge at all.[21]

10      The canons of statutory interpretation used in the preceding

11  sections provide little guidance here.  The Department of the

12  Interior has not, to the court's knowledge, interpreted these

13  terms.  The Blackfeet canon may support a broad interpretation of

14  "charge" generally.  In this case, however, a narrow interpretation

15  of "charge" appears equally likely to benefit tribes, as the

16  withheld RSTF funds would go to other tribes.  Without deciding

17  ─────────────────────

18      [21] In general, a "functional examination" is used to determine
    whether an "exaction . . . is a tax, a penalty, a debt, or
    something else." George v. Uninsured Emplrs. Fund (In re George),
19  361 F.3d 1157, 1160 (9th Cir. 2004).  For example, for purposes of
    the bankruptcy act, "[a] tax is a pecuniary burden laid upon
20  individuals or property for the purpose of supporting the
    Government." Id. (quoting United States v. Reorganized CF&I
21  Fabricators of Utah, Inc., 518 U.S. 213, 224 (1996)).  In another
    example, the Ninth Circuit uses a three part test to determine
22  whether an "assessment" is a tax or a fee for purposes of the Tax
    Injunction Act. Qwest Corp. v. City of Surprise, 434 F.3d 1176,
23  1183 (9th Cir. 2006) (citing Bidart Bros. v. Cal. Apple Comm'n, 73
    F.3d 925, 931 (9th Cir. 1996)).  See also Welch v. Henry, 305 U.S.
24  134, 146 (1938) (distinguishing taxes from contractual
    obligations), United States v. La Franca, 282 U.S. 568, 572 (U.S.
25  1931) (distinguishing taxes and penalties).
        The distinctions between taxes, fees, charges and other
26  assessments are not relevant here, as IGRA treats all equally.

whether the <u>Blackfeet</u> analysis should be case specific or should instead consider situations not currently before the court, the court simply concludes that <u>Blackfeet</u> does not strongly support the Tribe on this issue.

In any event, statutory construction requires that ordinarily words are given their ordinary meaning absent a reason to depart from that meaning.  "When terms used in a statute are undefined, we give them their ordinary meaning." <u>Cuomo v. Clearing House Ass'n, L.L.C.</u>, ___ U.S. ___, 129 S. Ct. 2710, 2723 (2009) (quoting <u>Asgrow Seed Co. v. Winterboer</u>, 513 U.S. 179, 187 (1995)); <u>see also</u> <u>Gross v. FBL Fin. Servs.</u>, ___ U.S. ___, 129 S. Ct. 2343, 2350 (2009). Absent compelling reasons to depart from the ordinary meaning of the words "tax," "fee," "charge," or "assessment," the court concludes that these words cannot be interpreted to encompass surrender of a right to receive payment.  Accordingly, forfeiture of RSTF payments is not within the scope of section 2710(d)(4).

### 2.   Revenue Sharing

The parties agree that revenue sharing is a fee, etc.  As explained above, insistence on a fee is permissible where the state offers a meaningful concession. <u>Coyote Valley II</u>, 331 F.3d at 1112, 1114.  <u>Coyote Valley II</u> did not define "meaningful concession," although it stated that the evaluation may turn on "the nature of both the fee demanded and the concessions offered in return." <u>Id.</u> at 1112; <u>see also</u> <u>id.</u> at 1115.  The Department of the Interior has concluded that a state offers a meaningful concession when (1) "the State concedes something that it was otherwise not

1   required to negotiate" and (2) this "concession[] result[s] in a

2   substantial economic benefit to the Tribe."   Letter from the

3   Principal Deputy Assistant Secretary of Indian Affairs to Kenneth

4   Blanchard, Governor of the Absentee Shawnee Tribe of Oklahoma

5   (December 17, 2004).    Insofar as this definition is an

6   interpretation of IGRA distinct from the Ninth Circuit's

7   interpretation, the court grants it <u>Skidmore</u> deference.

8       The State argues that it has offered a "meaningful concession"

9   in the form of "the ability to operate, free from non-Indian

10  competition" certain Class III gaming.   <u>Coyote Valley II</u> recognized

11  that the right to operate Class III gaming was distinct from the

12  promise to prohibit non-tribal entities from doing so.   On the

13  facts of the 1999 Compact negotiations, the panel concluded that

14  each offered a meaningful concession.   The State mistakenly argues

15  that <u>Coyote Valley II</u> thereby established that exclusivity was a

16  meaningful concession as a matter of law.   Contrary to the State's

17  argument, <u>Coyote Valley II</u> reached its conclusion after a fact

18  specific analysis, and the facts underlying these purported

19  concessions have changed.   On the facts here, the court concludes

20  that only exclusivity constitutes a concession.   A triable question

21  exists as to whether this concession provides a meaningful benefit

22  to the Tribe.

23          **a.   Permission to Conduct Class III Gaming Is Not A**

24               **Concession**

25       At the time of the 1999 Compact negotiations, California did

26  not permit any slot machines or other class III gaming of the type

46

1  sought by the tribes.  Pursuant to the Ninth Circuit's decision in

2  Rumsey, California therefore had no obligation to honor requests to

3  negotiate compacts for this type of gaming.  64 F.3d at 1258

4  (interpreting § 2710(d)(1)(B)).  Moreover, on August 23, 1999,

5  after negotiations had started, the California Supreme Court

6  concluded that state law prohibited the State from permitting

7  tribes to engage in such gaming.  Hotel Employees & Restaurant

8  Employees Internat. Union v. Davis, 21 Cal. 4th 585, 589 (1999).

9  Against this background, then-governor Davis's administration

10  proposed a constitutional amendment that would allow the State to

11  permit such gaming.  Coyote Valley II, 331 F.3d at 1103.  Davis

12  also negotiated with tribes, despite the fact that he was not

13  obliged to do so under the IGRA.  Id.  The State's willingness to

14  enter negotiations and offer the right to conduct gaming was a

15  concession, which had considerable value to the tribes.  Id. at

16  1112.[22]  Thus, permission to conduct gaming satisfied both steps of

17  the meaningful concession test.

18      In this litigation, the State again asserts that granting the

19  Tribe the right to conduct class III gaming is a meaningful

20  concession.  However, in light of the fact that the State now

21  "permits such gaming for any purpose by any person, organization,

22  or entity," § 2710(d)(1)(B), IGRA compels the State to negotiate on

23

24      [22] "[T]he State had no obligation to enter any negotiations at
   all with Coyote Valley concerning most forms of class III gaming.
25  Nor did the State have any obligation . . . to offer tribes the
   right to operate Las Vegas-style slot machines and house-banked
26  black-jack."  Coyote Valley II, 331 F.3d at 1112.

1  this issue.   <u>Rumsey</u>, 64 F.3d at 1258; § 2710(d)(3)(A).

2  Accordingly, by offering the right to conduct such gaming, the

3  State does not concede something that it was otherwise not required

4  to negotiate.

5       The Department of the Interior has implicitly joined in this

6  interpretation.   Through 2003, "the Department [of the Interior]

7  ha[d] approved payments to a State only when the State has agreed

8  to provide the tribe with substantial exclusivity for Indian

9  gaming."   Letter from the Acting Assistant Secretary of Indian

10 Affairs to Janet Napolitano, Governor of the State of Arizona

11 (January 24, 2003).   In calculating whether the benefit to the

12 tribe provided by a concession is substantial, the Department has

13 looked to the benefit provided by exclusivity, rather than the

14 benefit of gaming generally.   <u>Id.</u>, <u>see also</u> Letter from Principal

15 Deputy Assistant Secretary of Indian Affiars to Kenneth Blanchard,

16 Governor, Absentee Shawnee Tribe of Oklahoma (Dec. 17, 2004).

17 Thus, the Department has not considered mere permission to conduct

18 gaming a concession

19      Accordingly, the State's willingness to approve gaming and

20 enter a compact is not a meaningful concession.

21            **b.   Exclusivity Is A Concession**

22      The State also offers the Tribe exclusivity, in the form of a

23 ban on non-tribal gaming.   The California Constitution currently

24 prohibits non-tribal gaming statewide.   <u>Coyote Valley II</u> held that

25 "the State['s] propos[al of] a constitutional amendment protecting

26 tribal gaming enterprises from free market competition by the

1   State" was a meaningful concession.  331 F.3d at 1115.  The State

2   has since promised, in compacts with other tribes, to maintain this

3   prohibition with respect to specific geographic areas.  The State

4   offers a similar promise here.

5       The Tribe responds that constitutional prohibition on non-

6   tribal gaming has already been enacted, such that the offer of

7   market protection from non-tribal gaming is no longer a concession.

8   However, the State's existing obligations regarding exclusivity

9   differ from its obligations to negotiate and permission to conduct

10   gaming.  The latter arise under federal law that is beyond the

11   State's control.  The former arise purely under state law.  The

12   State could amend its constitution to permit non-tribal gaming.

13   Existing compacts reflect this possibility, stating that in the

14   event non-tribal gaming becomes permitted within the zone of

15   exclusivity offered to the tribe, provisions offered to the State

16   in exchange for this concession will be vacated.  See, e.g., Pl.'s

17   Request for Judicial Notice, Ex. 6 (Tribal-State Compact Between

18   the State of California and the Pinoleville Pomo Nation, executed

19   March 10, 2009).  Coyote Valley II held that the State's

20   willingness to amend its laws, even when this amendment required

21   voter approval, could be a meaningful concession.  331 F.3d at

22   1115.  A State's willingness to preserve its laws is not materially

23   different.[23]  To the extent that this conclusion is not compelled

24

25      [23] But see Rincon Band of Luiseno Mission Indians of the
Rincon Reservation v. Schwarzenegger, No. 04-cv-1151 (S.D. Cal.

26   April 29, 2008) (McCurine, M.J.).  Rincon Band was a signatory to
the 1999 Compacts.  The Tribe sought to renegotiate portions of

1   by Coyote Valley II, the court notes that it is consistent with the

2   view adopted by the Secretary of the Interior, who has continued to

3   approve, since 2000, of California State-Tribal compacts with

4   revenue sharing provisions premised on the offer of exclusivity as

5   a meaningful concession.   See, e.g., Pl.'s RJFN Ex. 6.

6            **c.   A Triable Question Exists As To Whether Exclusivity**

7                 **Provides A Meaningful Benefit To The Tribe**

8        Under the Secretary's two-step analysis, the second question

9   is whether this concession provides "substantial" benefits to the

10  Tribe.   Letter from the Principal Deputy Assistant Secretary of

11  Indian Affairs to Kenneth Blanchard, Governor of the Absentee

12  Shawnee Tribe of Oklahoma (December 17, 2004).   This issue presents

13  a triable question.

14  _____

15  their compact, and filed suit objecting to certain provisions
    sought by the State, including an unrestricted revenue sharing
16  provision. The Rincon Band court held that

17              the consideration that was already given
                (exclusivity) for the mutual compact [the 1999
18              compacts] cannot be repeatedly reused as a
                basis for the State's desire for a new compact
19              . . . . In this Court's view, the State has
                not offered exclusivity because exclusivity
20              already exists.

21  Id. at 18.   The fact that Rincon Band concerned an attempt to
    renegotiate an existing compact, rather than to adopt a new
22  compact, at least partially distinguishes that case from this one.
    There, the State had already offered exclusivity to the Rincon
23  Tribe in adopting the prior compact, and the court relied at least
    in part on this fact rather than on the state's general policy of
24  prohibiting non-tribal gaming.   Id. at 19.   However, the court also
    expressed skepticism about the idea that refraining from amending
25  the constitution was a concession.   Id. at 20. It appears to this
    court to be a much more difficult question than it did to the
26  Rincon Band court.

While the State concedes that the court must evaluate the first step (whether the State has offered a concession), the State argues that only the Secretary of the Interior can answer the second (whether the concession offers meaningful benefits to the Tribe). This argument is belied by <u>Coyote Valley II</u>, wherein the court determined that the concessions provided a fair exchange, 331 F.3d at 1115, and by the fact that the Secretary evaluates compacts only after the parties have agreed to them, such that the Secretary does not take part in the good faith analysis.[24]

In <u>Coyote Valley II</u>, rather than evaluate the benefit itself, the court relied on other parties' valuations, notably, the facts that "[t]he tribes who drafted and placed Proposition 5 [containing a model compact] on the ballot thought [the] exchange was fair," and that "[t]he former Secretary of the Interior also appears to believe [that the] exchange is fair, given that he approved the Davis [1999] Compact in May 2000." <u>Coyote Valley II</u>, 331 F.3d at 1115. Here, the Tribe argues that the State's proposals differ from other compacts in a way that precludes comparison to third parties' valuations. The Tribe's primary argument is that no other

---

[24] If, as the State argues, the courts are prohibited from evaluating the benefit provided by a concession in the good faith analysis, a Tribe that contends that the benefit is inadequate will be forced to either surrender the possibility of a compact (because, absent a showing of bad faith, the Tribe will not be able to compel the State to enter a compact) or to agree to a compact despite this objection in the hopes that the Secretary will conclude that the agreed-upon compact provides an inadequate benefit. The State's position thereby frustrates the purpose of good faith review.

Tribe has surrendered the right to receive RSTF payments.[25]
However, the court has determined that forfeiture of RSTF payments
is not a "tax, fee, charge, or other assessment," and the adequacy
of a concession is determined by reference to "the nature of . . .
the fee demanded."  Coyote Valley II, 331 F.3d at 1112.  The
benefit of exclusivity is therefore weighed against the burden of
revenue sharing.  The Tribe concedes that other compacts have
included revenue sharing at levels similar to those proposed here,
but argues that exclusivity is worth less in this case than it is
to other tribes.

Absent an independent evaluation, the court must itself
evaluate the benefit.  The Secretary appears to evaluate compacts
by estimating whether the Tribe stands to realize greater revenue
if both revenue sharing provisions and exclusivity are included

---

[25] Although the court finds this distinction irrelevant, the
undisputed evidence demonstrates that no Tribe operating fewer than
350 machines has relinquished RSTF payments and also agreed to make
unrestricted revenue sharing payments to the State, and as a
result, the Secretary has not evaluated such a forfeiture.  C.f.
Compact of the Fort Mojave Indian Tribe, 69 Fed. Reg. 76004
(compact permits 1,500 gaming devices, calls for relinquishment of
RSTF payments, and for payment of at least 12% of annual revenue),
Compact of the Pinoleville Pomo Nation, March 10, 2009 (authorizing
up to 900 devices, 15% revenue sharing, and payments into the RSTF
if the tribe operates more than 700 gaming devices).  Instead, the
State has permitted other tribes to operate fewer than 350 devices
and to continue to receive RSTF payments.  In particular, the Tribe
points to the Yurok compact, which was also negotiated by the
Schwarzenegger administration.  The Yurok compact provides for 99
devices, retention of RSTF payments, and the same schedule of
revenue sharing proposed to Fort Independence on Aug. 30, 2007.
Fort Independence's situation differs in some important regards.
Fort Independence seeks permission to operate up to 349 devices,
rather than 99, and has 150 members, as opposed to the 4,000 in the
Yurok Tribe.

than the Tribe would realize if both were omitted.  Pl.'s RFJN Ex. 1, 2; see also Oversight Hr'g on the Indian Gaming Regulatory Act of 1988 before the Sen. Comm on Indian Affairs, 108th Cong. 67, pt. 2, p. 3 (2003) (testimony of Aurene M. Martin, Acting Assistant Secretary-Indian Affairs, Dept. of the Interior, July 9, 2003). The court follows this approach here.

If exclusivity is maintained, the parties estimate that the proposed casino will produce between $5.4 and $6.8 million in gaming revenue.  During negotiations, the Tribe commissioned a "gaming market assessment," which was completed in November of 2006.  Houck Decl. Ex. AA (Doc. 60-10).  The gaming market assessment assumes that the Tribe will operate between 120 to 150 machines and will benefit from exclusivity.  Id. at FI 937.  Based on these assumptions, it predicts that annual revenue will reach $5.9 million.  Id. at FI 396.[26]  The State adopts this prediction, with the caveat that in 2009 dollars, projected revenue will be $5.4 million.  Declaration of William R. Eadington, ¶ 12 (Doc. No. 87-2).  The Tribe has commissioned a second study in connection with this motion, which estimates that with exclusivity, annual gaming revenue over the first five years of operation would range from $6 to $6.8 million.  Declaration of Klas Robinson, Ex. C, 2 (Doc. No. 85).

The parties' estimates of revenue without exclusivity are not

---

[26] The assessment predicted annual revenues of $6.9 million if a proposed competing tribal gaming facility at Bishop Paiute Palace did not open.  Houck Decl. Ex. AA at FI 396.  The Paiute Palace Casino has since been opened.

1   so similar.  The Tribe estimates that without exclusivity, revenue

2   would be reduced between $480,000 and $1.4 million annually.

3   Robinson Decl. Ex. C, 2.  This represents roughly a 7% reduction

4   from the Tribe's "with exclusivity" prediction.   The State

5   estimates the reduction at $4.3 to $5.1 million, or 80% percent of

6   the State's "with exclusivity" estimate.  Eadington Decl. ¶ 16.

7   For purposes of the instant cross motions, the court concludes that

8   both parties' expert testimony is admissible.[27]  Measured against

9   the State's requested revenue sharing of 10 to 25 percent, under

10  the Tribe's estimate, exclusivity does not provide a substantial

11  benefit, whereas under the State's estimate, exclusivity does.

12      The Tribe also asserts that the court should look to

13  exclusivity's effect on profit, rather than revenue.  Because the

14

15      [27] Robinson, the Tribe's expert, bases his estimate on
    analysis of video lottery machines operated in South Dakota and
16  Montana, after concluding that competitors in this region are
    unlikely to use other forms of gaming, and that other states
17  permitting similar gaming types do not share similar geographic and
    demographic characteristics.  Robinson Decl. 23-24.
18      Eadington, the State's expert, compares performance of casinos
    in California, where non-tribal gaming is prohibited, with casinos
19  in Nevada, where there is no such prohibition.  Eadington Decl. ¶
    5.  Eadington also relies on the fact that the Tribe is located in
20  a rural area, and estimates that if non-tribal gaming was
    permitted, potential customers would be likely to visit more
21  conveniently located non-tribal facilities.   Id. ¶¶ 13-14.
    Eadington further predicts that the direct decrease in expected
22  revenue would lead to an additional indirect decrease in
    profitability, because lenders, faced with the prospect of lowered
23  revenues, would provide financing to the Tribe on less attractive
    terms.  Id. ¶ 15.  This final prediction, however, does not appear
24  to have been incorporated into Eadington's analysis.
        The court concludes, for purposes of this motion, that both
25  declarations are admissible expert testimony.  The parties
    nonetheless are not barred from challenging these expert opinions
26  in future proceedings.

relationship between revenue and profit is largely under the Tribe's control, it is not clear that this is the proper approach. Even if the court were to adopt this approach, however, the dispute would remain.  The Tribe estimates that with neither exclusivity nor revenue sharing, the Tribe will receive between $212,000 and $826,000 in annual profit over the first five years of operation, but that with both, the Tribe's effective annual profit will range from $198,000 to $402,000 over the same period.  Robinson Decl. at 2, 22, 29 (scenarios 2 and 5).  While the State does not specifically estimate exclusivity's effect on profit, a trier of fact could find that for any reasonable relationship between revenue and profit, and 80% decrease in revenue would also provide a greater than 10 to 25% decrease in profit.

Accordingly, there is a dispute as to whether exclusivity is a meaningful concession.  Neither party is entitled to summary judgment on the issue of whether the State has sought to impose a tax or whether any demand for a tax was itself bad faith.

**C.   Other Evidence of Good and Bad Faith**

Each party argues that it is entitled to summary judgment even if a question remains as to whether exclusivity is a meaningful concession.  The Tribe argues that the State has impermissibly adopted a "take it or leave it" attitude in negotiations.  The State argues that because the disputed provisions were initially proposed by the Tribe, the State's continued requests for these provisions is not bad faith.  The court addresses each argument in turn, rejecting both.

1    The Tribe cites <u>Seattle-First Nat'l Bank v. NLRB</u>, 638 F.2d

2    1221 (9th Cir. 1981), a case interpreting the NLRA, for the

3    proposition that a "take it or leave it" attitude is evidence of

4    bad faith.   <u>Seattle-First Nat'l</u> stated that a party "cannot

5    maintain an attitude of 'take it or leave it.'"   <u>Id.</u> at 1227 n.9

6    (citing <u>NLRB v. Ins. Agents' Int'l Union</u>, 361 U.S. 477, 485

7    (1960)).   This statement, however, was made in the context of the

8    court's discussion of "surface bargaining," wherein a party

9    negotiates in bad faith by "going through the motions of

10   negotiating, *without any real intent to reach an agreement*."   <u>Id.</u>

11   (quoting <u>K-Mart Corp. v. NLRB</u>, 626 F.2d 704, 706 (9th Cir. 1980))

12   (emphasis added, internal quotation marks removed).   While a "take

13   it or leave it" attitude may be evidence of surface bargaining, and

14   therefore of bad faith, the NLRA caselaw explicitly permits a party

15   to bargain to the point of impasse with respect to mandatory

16   subjects.   <u>Borg-Warner</u>, 356 U.S. at 350.   Insistence on a position

17   therefore does not itself demonstrate bad faith.   <u>C.f.</u> <u>Sparks</u>

18   <u>Nugget, Inc. v. NLRB</u>, 968 F.2d 991, 995 (9th Cir. 1992) ("The

19   failure to compromise, the proposal of a contract that gave

20   management total control of wages, seniority, and work rules, and

21   the unwillingness to schedule long or frequent meetings, support

22   the inference of bad faith and surface bargaining.").   In the IGRA

23   context, <u>Coyote Valley II</u> found that the state's insistence on

24   revenue sharing and RSTF provisions consistent with good faith.

25       In this case, the evidence demonstrates that the state

26   insisted upon revenue sharing of at least 10 percent, in that every

1   offer made by the State included at least this level of revenue
2   sharing, and nothing indicates that the State would have accepted
3   a lesser degree of revenue sharing.  The evidence would also enable
4   a trier of fact to conclude that the State insisted on forfeiture
5   of RSTF payments, in that each offer made by the State involved
6   eventual surrender of these payments.  However, a trier of fact
7   could conversely find that the State would have ultimately been
8   willing to abandon this second request, in light of the State's
9   willingness to negotiate delayed elimination of these payments and
10  the fact that the State has allowed other tribes to retain RSTF
11  payments.

12      Here, the insistence on revenue sharing is insufficient to
13  determine, on summary judgment, that the State engaged in surface
14  bargaining and therefore acted in bad faith.  Unlike in Sparks
15  Nugget, the State has demonstrated some willingness to compromise
16  with regard to the precise level of revenue sharing,
17  notwithstanding the fact that all proposals involve revenue sharing
18  of at least ten percent.  A material question remains as to whether
19  the state offered a meaningful concession, and thus whether the
20  offer was reasonable.  The Tribe has provided no evidence of a
21  procedural failure of negotiation, such as inadequate meeting
22  times.  Accordingly, the court cannot conclude that the State's
23  insistence here differs from the insistence in Coyote Valley II,
24  such that it demonstrates surface bargaining.

25      As to the State's remaining argument, the State argues that
26  revenue sharing was initially proposed by the Tribe, in that the

1  Tribe's initial proposal included a preamble stating that revenue

2  sharing was appropriate.  However, this "initial proposal" was made

3  in the light of the State's pervasive policy of extracting revenue

4  sharing from Tribes since adoption of the 1999 compacts.  Moreover,

5  the quantity of revenue sharing was proposed by the State, not the

6  Tribe.   Where the State had established its desire for revenue

7  sharing prior to the commencement of negotiations and where the

8  State has uniformly sought at least ten percent revenue sharing

9  notwithstanding repeated, albeit inconstant, objections by the

10  Tribe, the State cannot attribute the proposal for revenue sharing

11  to the Tribe.

12  **IV. CONCLUSION**

13     For the reasons stated above, both parties' motions for

14  summary judgment (Doc. Nos. 53 and 54) are DENIED.   The court

15  grants summary adjudication as to the following issues:

16     * The State's proposal comport with 25 U.S.C. section
       2710(d)(3)(C)
17
       * Forfeiture of the right to receive RSTF payments is not a
18     tax, fee, charge, or assessment.

19     * The offer of permission to conduct Class III gaming is not
       a "concession."
20

21     * The offer of exclusivity is a concession.

22  A material question exists as to whether the concession of

23  exclusivity is meaningful.  The matter will proceed for resolution

24  of this issue.

25     IT IS SO ORDERED.

26     DATED:  December 23, 2009.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT